# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff*, | **Case No.** 5:21-cr-371 |
| v. | **Judge Solomon Oliver Jr.** |
| **DELBERT GARFIELD STEWART,** | |
| *Defendant.* | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Delbert Stewart has always lived his values—and that has almost always brought only good results. As his long-time partner, children, neighbors, and friends can all attest, Mr. Stewart is unfailingly generous with his time and money, gives back to his community, provides second chances for those who are down on their luck, and is an exemplary father. All the hallmarks of a person who stands up for what he believes and does what he believes to be right.

So, when the Federal Aviation Administration sought to suspend or revoke Mr. Stewart's airman's certificate, it is unsurprising that he pushed back. But Mr. Stewart now concedes that continuing to fly his plane without consulting counsel about the best way to contest the FAA's actions was a mistake. And he acknowledges that, under this Court's interpretation of the statute charged in the indictment, he violated the law by doing so.

Even so, the defense submits that—considering Mr. Stewart's exemplary history of community involvement; his limited potential for future income; the financial, reputational and other injuries he has already suffered; and the nature and circumstances of the offense—a

probationary sentence, with minimal conditions (including no home confinement), and a minimal fine is well warranted.

## ARGUMENT

The touchstone of federal sentencing is Congress's directive that courts impose "a sentence sufficient, but not greater than necessary" to accomplish the rehabilitative and retributive goals of sentencing. 18 U.S.C. § 3553(a). This Court's mission, therefore, is to select a sentence that is just right—neither more lenient nor more punitive than needed given the personal characteristics and background of the defendant and the circumstances of the crime. *United States v. McDonel*, 513 F. Supp. 3d 752, 759 (E.D. Mich. 2021) ("A sentence that is too harsh undermines respect and confidence in the criminal justice system just as does a sentence that is too lenient."). In short, "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). In this case, both the Sentencing Guidelines and the sentencing factors established by Congress overwhelmingly point to a probationary sentence and a fine at the bottom of the guidelines range and with minimal conditions affecting Mr. Stewart's liberty.

## A.    THE § 3553(A) FACTORS POINT TO A PROBATIONARY SENTENCE AND A FINE AT THE BOTTOM OF THE GUIDELINES RANGE.

When deciding on a sentence in a criminal case, federal courts begin by calculating the correct guidelines range under the United States Sentencing Guidelines. *United States v. Lee*, 974 F.3d 670, 676 (6th Cir. 2020). After all, even post-*Booker*, the Guidelines remain the "starting point and initial benchmark" for sentencing. *Hughes v. United States*, 138 S. Ct. 1765, 1775 (2018) (citations omitted).

Here, the Government, the Probation Office, and Mr. Stewart agree that, under the Sentencing Guidelines, Mr. Stewart's total offense level is eight (8) and that (given his lack of any criminal history) he has a criminal history category of I. Thus, his guidelines range places him in

Zone A, permitting straight probation under the guidelines, with the possibility of a fine ranging from $2,000 to $20,000. Therefore, the Court can move directly to the next step.

**B.     THE § 3553(A) FACTORS POINT TO A PROBATIONARY SENTENCE AND A FINE AT THE BOTTOM OF THE GUIDELINES RANGE.**

Having calculated the guidelines range, the Court must consider the factors described in § 3553(a) to determine when a defendant's sentence should fall within the guidelines range and whether a departure or variance from the guidelines is warranted. *See United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006) ("Once the appropriate advisory Guideline range is calculated, the district court throws this ingredient into the section 3553(a) mix. Considering, as Booker requires, all of the relevant section 3553(a) factors, including the Guideline range, the district court then imposes a sentence."). In doing so, it "must be mindful that the Sentencing Guidelines 'reflect a rough approximation of sentences that *might* achieve § 3553(a)'s objectives' and the Sentencing Commission has carried out those objectives at 'wholesale.'" *United States v. Tomko*, 562 F.3d 558, 575 (3d Cir. 2009) (emphasis added) (citation omitted). The sentencing judge, [though,] must carry out Section 3553(a)'s objectives "at 'retail,' because the sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or" an appellate court. *Id.* (cleaned up).

For Mr. Stewart, this individual assessment under the Section 3553(a) factors points to a shorter, probationary sentence, without conditions of confinement, and a fine at the bottom of the guidelines range.

**1.     The nature of Mr. Stewart's offense warrants a lower probationary sentence and minimal fine.**

Section 3553(a) first requires the Court to consider the nature of the offense and the need to ensure that the sentence imposed reflects the seriousness of the offense and provides just

punishment. A one (1) year, to perhaps three (3) year, probationary sentence, without any condition of confinement (such as home detention), and a fine at or near the bottom of the guidelines range, is entirely sufficient here for at least four reasons.

*First*, while violating any federal criminal statute is a serious matter, this case is ultimately about a regulatory infraction: Mr. Stewart's decision to continue to fly his plane after the FAA issued orders purporting to suspend or revoke his airman's certificate. It does not involve violent conduct, injury to others, dangerous substances, or even financial harm. Nor does this case involve downstream efforts to further or cover up underlying criminal activity like drug smuggling, theft, illegal entry, or terrorism. Nor was Mr. Stewart illegally flying for commercial gain—he used his plane only for personal travel (as his airman's certificate allowed). **(Ex. A – Copy of Airman's Certificate**.) After all, the applicable statutes would have allowed the FAA and DOJ to pursue this case as a civil matter rather than criminal matter. These factors weigh heavily in support of a sentence to a year on probation and a minimal fine (if any).

Indeed, the statute Mr. Stewart violated does not require the Court to impose any term of incarceration. *See* 49 U.S.C. § 46306(b)(7). Congress therefore "not only envisioned, but accepted, the possibility that some defendants found guilty . . . would [deserve and] receive no jail time at all." *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007). And nearly all offenders with his offense level (i.e., those in Zone A) do not receive any term of imprisonment. *See* Presentence Investigation Report ("PSR") ¶ 82 (noting that 85% of offenders with an offense level of 8 and criminal history category of I received no jail time).

As the Supreme Court has recognized multiple times, while probationary sentences are more lenient than incarceration, they still result in a "substantial[ ] restrict[ion]" of liberty. *See Gall v. United States*, 552 U.S. 38, 48 (2007) ("We recognize that custodial sentences are

qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." (internal quotation marks omitted)). A one-year term of probation, with minimal conditions, is thus more than sufficient to impress on Mr. Stewart—a veteran and former police officer—the seriousness of his errors.

*Second,* a probationary sentence is especially warranted here because Mr. Stewart did not simply ignore the notices he received from the FAA. He repeatedly attempted to challenge them. For example, in response to an email from an FAA attorney asking if he planned to appeal one of the FAA's orders, Mr. Stewart wrote a long response laying out his legal challenges to the FAA's actions. (**Ex. B – September 18, 2014, Email to Brian Khan.**) While an email is not the formal way to appeal an FAA ruling, and the FAA apparently chose not to treat Mr. Stewart's response as an appeal, his efforts to communicate with the agency do show that Mr. Stewart wanted to resolve the matter—not blow it off.

Indeed, Mr. Stewart consistently asked the FAA to bring his case to court, where he could have a hearing before a judge, including in the attached letter he sent the FAA in March 2020. (**Ex. C – March 21, 2020, Letter to Brian Khan**.) In his various letters and other correspondence, Mr. Stewart encouraged the FAA to file a civil action against him in a federal district court, which he believed was required by law and would afford him greater process protections. He even sued the FAA in this Court to try to resolve the matter, though that case was ultimately dismissed after he was arrested. (**Ex. D – Compl. in 5:20-cv-2818; Ex. E – Dismissal Order**.)

The FAA also never warned Mr. Stewart in writing that, if he continued to fly his plane while he contested the agency's administrative decisions, he could be charged criminally. In notice after notice, the FAA instead warned him only of potential civil penalties. (**Ex. F – Compiled FAA Notices.**) Indeed, the first time anyone told him he could be facing criminal charges was when Department of Transportation investigators intercepted his plane at the Portage County airport in early 2021. Mr. Stewart voluntarily surrendered his airman's certificate that same day and has not flown since.

The legal theories Mr. Stewart advanced in his emails, letters, and lawsuit were—to say the least—unconventional. He acknowledges now that there were better ways to handle his dispute with the FAA, including consulting an attorney earlier in the process. And, of course, a crime is a crime, even if you are not warned you might be committing one. But that is not the point. The point is that they show a genuine effort and desire to comply with the law and resolve his dispute with the FAA through civil process. They also show that—given the relative obscurity of the statute charged—Mr. Stewart could perhaps be excused for not knowing he was committing a crime. While these facts may not add up to a defense, they weigh in favor of a limited term of probation and a minimal fine.

*Third*, Mr. Stewart has already suffered significant personal, financial, and reputational consequences because of this case. Until he was charged, Mr. Stewart ran a successful roofing business in the Northeast Ohio area and planned to continue to do so for at least a few more years. But once word got around that he was facing potential criminal charges, many of his customers decided to change roofers—wary of dealing with someone who might be spending time in federal prison. As a result, he was forced to close the company and retire in April of this year.

Mr. Stewart has also had to draw down a substantial portion of his personal assets to pay attorneys' fees and other expenses related to defending himself in this case. These expenses, coupled with the loss of his business, make a substantial fine especially unnecessary.

Moreover, despite Mr. Stewart's long history of community and civic service—described below—one of the first Google results his grandchildren will likely find when entering his name is now a DOJ press-release about his indictment. That is a heavy price to pay for a man with no criminal history.

Beyond all that, as Mr. Stewart's son Jeremy notes in his letter of support, flying has been a life-long interest of Mr. Stewart and something he always loved to do.

> My father got his Pilot's Certificate just before I was born, something he had always wanted to do.  I remember as a little boy when we lived in Fort Meyers, Florida, flying with my dad in our landlord's sea plane out to the island he was building a house on.  We would stop and collect horseshoe crab shells to take back home and show my mom and my sister.  I remember, even as a boy of only 4 years old, the joy and excitement in my father's face when we would fly.  I never saw him more attentive or focused, then when we were in the sky.  After we moved back to Ohio from Florida, I did not fly with my father again until I was an adult.  And when he started flying again, I saw the same excitement and joy in his eyes.

(**Ex. G – Character Letters** at 11.) Because of this case, however, he will probably never fly again. Indeed, he is already in the process of selling his plane.

These costs, combined with the embarrassment and natural consequences of being a felon and on probation, more than justify imposing only a relatively limited term of probation. And they certainly militate strongly against a lengthy term of probation, a term of home confinement, or the need for a large fine. *See United States v. Pauley*, 511 F.3d 468, 474–75 (4th Cir. 2007) (Consistent with § 3553(a)'s directives regarding "just punishment" and "adequate deterrence," district court properly considered defendant's loss of teaching certificate and state pension as factors in granting a 36-month downward deviation from Guidelines).

*Finally*, Mr. Stewart has accepted responsibility for his actions from the beginning of this case. He has never denied receiving notices from the FAA or flying his plane on the dates charged in the indictment. After this Court denied his motion to dismiss, he pleaded guilty at near the start of trial—reserving his disagreement with the Court's view of the law for appeal and apologizing to the Court for the inconvenience and expense of gathering a panel for voir dire. This too suggests that a year of probation on limited conditions is the appropriate sentence in this case.

### 2.    A probationary sentence provides adequate specific deterrence.

Next, Section 3553(a) requires the Court to impose a sentence that affords "adequate deterrence to criminal conduct" and "protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(2)(B) & (C). A probationary sentence and fine near the bottom of the guidelines range does both in this case.

To start, Mr. Stewart has always acknowledged that, without his airman's certificate in his physical possession, he cannot fly his plane. Indeed, he has not flown his plane since the FAA seized the certificate well before his arrest. It follows that, because the FAA is unlikely to return his certificate (absent perhaps a successful appeal or future litigation), there is no real risk of Mr. Stewart improperly flying his plane again.

Mr. Stewart has also been a model pretrial supervisee since he was arrested in this case. He has adhered to the Court's pretrial supervision conditions, including requesting permission for each trip out of state well in advance and refusing even to enter the cockpit of his plane to perform routine maintenance. Put another way, when Mr. Stewart gives his word, he keeps it. There is no reason to think he would behave any differently on probation.

And Mr. Stewart's conduct in this case shows that he has learned from his mistakes. While he continues to disagree with the FAA's view of its legal authority and the government's

interpretation of the statute under which he was charged, he has not reacted to his indictment or this Court's order siding with the government in the same way he responded to FAA notices in the past. Instead, he has retained counsel to advise him throughout the case and to represent him on appeal.

More than that, his characteristics suggest he is unlikely to reoffend.

Mr. Stewart grew up in a stable, working-class home in Akron, where he helped his father raise horses—cleaning out six stalls a day. (PSR ¶ 43.) After graduating high school and attending one quarter at Kent State University, he served in the U.S. Army for three years before being honorably discharged and becoming a police officer. (*See Id.* ¶ 53.) Shortly afterward, in July 1974, he started his own roofing company, which he operated for nearly 50 years—until he was forced to retire in April 2022.

The Sentencing Commission has recognized that defendants with a stable employment history are less likely to reoffend. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (May 2004), available at: https://tinyur.com/y4wf5s22 (finding that 19.6% of offenders with stable employment in the year before their arrest recidivate versus 32.4% of unemployed offenders). Moreover, this is Mr. Stewart's first criminal conviction—ever. The Sentencing Commission has found that the re-conviction recidivism rate of offenders with no earlier arrests was only 2.5 percent.[1] U.S. Sentencing Commission, *Recidivism and the "First Offender"* 5, 14 & n.28 (May 2004), available at: https://tinyurl.com/yy6slh87.

---

[1]  The "re-conviction" rate "limits recidivism to the first-conviction during" a "two year follow-up period." *Id.* at 13. The Sentencing Commission also calculated a "primary recidivism" rate, which includes not only convictions but also (1) re-arrests that had not led to a conviction as of the time of the report and (2) supervision revocations. *Id.* at 12–13. The primary recidivism rate for first-time offenders with no earlier arrests was 6.8 percent. *Id.* at 14.

The import of Mr. Stewart's lack of criminal history is magnified by his age: That he has "lived an exemplary life to this point," "had a life full of noteworthy activities," and is 72 "years of age and . . . avoided violations of the law up until this point in his life" support a lower sentence. *See United States v. Smith*, 275 F. App'x. 184, 186–88 (4th Cir. 2008); U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), available at: https://tinyurl.com/yaga2dgt (finding that only 13.4 percent of offenders over age 65 were rearrested, compared to 67.5 percent of offenders younger than 21 at the time of release, and that only 11.3 percent of over-60 offenders with a criminal history category of one were rearrested). Thus, a short term of probation with few conditions and minimal fine is more than sufficient to deter any future criminality.

In sum, this is not a hardened career criminal. Mr. Stewart's single act of criminal conduct was his first serious brush with the law in his life and is unlikely to be repeated—especially because he no longer has his airman's certificate. Thus, this factor also weighs in favor of a one-year term of probation on minimal terms.

### 3. Mr. Stewart has been a key source of support for his family and community, suffers from several health conditions, and has limited sources of future income.

Third, Section 3553(a) requires the Court to consider the characteristics of the defendant, including his need for medical care and his financial condition. 18 U.S.C. § 3553(a)(1) & (2)(D).

When reading the letters of support Mr. Stewart's friends, family, and neighbors have provided here, his generosity and commitment to his community is almost tangible. For example, several neighbors describe Mr. Stewart's selfless attempt to rescue a young man who crashed in a nearby pond:

> Delbert has been a pillar of strength and compassion when life is difficult. Years ago, we experienced the unfortunate drowning death of a young man in the pond

on our property. Delbert was among the first responders, even attempting a rescue in frigid water temperatures. He stayed with us as our land was overtaken by ambulances, sheriff and police cars, firetrucks, telescoping lights, hovercrafts and more. The accident was a challenge to our entire community, and Delbert generously gave of his time and resources to comfort us as well as the families impacted by this tragedy. Ironically, amidst the turmoil, we felt safer with his support.

**(Ex. G** at 14.)

I also know that approximately 10 years ago three young men were speeding on the way home from the high school baseball practice and lost control of their automobile and it went off the road and ended up upside down in a small pond adjacent to Delbert's house. Delbert grabbed a scuba tank and a mask and jumped into the cold water in an attempt to save the young man that was trapped. Sadly his efforts were not successful . . . .

(*Id.* at 8.) There are not many people—outside emergency response and the military—so willing to put their life on the line for a stranger. But Delbert Stewart is one of them.

More than the heroics, however, it is in the day-to-day kindnesses the letters describe that attest to Mr. Stewart's true character. For example, the letters overflow with examples of repairs or help Mr. Stewart has given his neighbors over the years:

- **Jack Skinner:** "We own a couple Sea Doo's. Several years ago as we were preparing for vacation, I was attempting to get them running after being stored for the winter. I was not able to get one of them going. Delbert observed my efforts from his house and walked over to my garage. He looked at it briefly, then asked me to bring it over to his garage. He spent many hours working on it over the next week. He completely went through the fuel system and replaced the starter solenoid. I offered to pay, but all he said was to 'have fun.'" (*Id.* at 5.)

- **Linda Sepsey:** "Delbert dropped what he was doing on a frigid January Sunday morning this year to come to our home and fix a problematic kitchen faucet. He also helped my husband, who has some issues with balance and mobility, with installation of garden sculptures at our home." (*Id.* at 13.)

- **Randy and Cheryl Snyder:** "One example, of Delbert's generosity is how he helped us during a severe winter season. We had several business locations that needed to be plowed after every snowfall. Our own plow truck had broken down and was beyond repair. Business was slow, coming out of the 2008 recession, and purchasing a new truck or hiring an outside service would have been a

— 11 —

financial hardship on our business and our family. Delbert heard about our situation and immediately offered us his plow truck, free of charge, for the remainder of the winter season. He gave us the code to his garage and would actually call, when he needed to use his own truck, to make sure we did not need it first. We repeatedly offered to pay for the use of the truck but Del would not hear of it." (*Id.* at 17.)

Mr. Stewart has also been an active member and support of community organizations, including the local Jitterbug dance club he and his long-time partner Sharon often attend. As John Inks, the club president, describes: "In Delbert's family they are the proud owner of a vintage jukebox holding many, many records. Delbert has decided to share those treasures with others by placing that jukebox at our dance facility for all to see and potentially use again." (*Id.* at 12.) He has volunteered for more than a decade as a poll worker. (*Id.* at 16.) He has employed those with criminal histories or drug addiction issues, giving them a second chance. And more.

And as both Sharon and his son, Jeremy, write, this generosity and dedication has been an inspiration to and ballast for his family:

- **Sharon Lichon:** "My experience with Delbert has been that he will offer and then do anything to help anyone who appears to be in need. . . . I was present the day a man and his daughter-in-law broke down in front of Delbert's house. He never hesitated to tow their horse trailer into his shop and proceeded to lift it up with a winch and fix the horse trailer so they could safely continue their trip to their home in South Carolina. This was not a quick fix and it took a couple of hours, but his only goal was to get them safely on the road and back home without another break down. (*Id.* at 21-22.)

- **Jeremy Stewart:** "My parents divorced when I was 9 years old and my mother, myself and my sister moved to Georgia to be closer to my mother's family.  My father was 700 miles away, but I always had a close relationship with him, even to this day.  He would make the trip down to Georgia every single chance he got, even if that meant driving 12 hours after working a 12-hour day, just to get to spend a day and a half with me and my sister.  Our trips to and from Ohio for Summer break, Thanksgiving and Christmas will be some of my fondest memories for the rest of my life.  Our road trips were always adventures.  On a trip back from our Family Reunion one summer, the van that we were driving blew the motor, what should have been a stressful event was turned into a memorable road trip.  The next day

> when he rented a tow dolly to go and pick up the van, we discovered after driving the 2 ½ hours back to where the van was, that it didn't fit on the dolly.  Now this was way before cell phones and the internet, so in order to find an appropriate piece of equipment to get back home, he and I hit the back roads looking for a Uhaul facility.  Again, what should have been an aggravating, stressful situation, my dad turned into an adventure and a learning experience for me.  We found the right tool, hooked the van to the truck and the dolly to the van and made our way home!!  Memories made at every turn in my life."  (*Id.* at 10.)

This, in short, is a man who cares deeply about his family, doing the right thing, and his community. Or in the word of his friends: "Many of us talk the talk, Delbert walks the walk":

> He is an American Original, a living proof example of all things good about this country. He does so not just by his words, but by his actions as well. He does countless favors for others with zero expectation of anything in return. Why? Because, as he will tell you, it's the right thing to do. Service to others is another common theme about Delbert."

(*Id.* at 2–3.)

All of this is made even more impressive by Mr. Stewart's limited financial resources and growing medical expenses. As the PSR makes clear, Mr. Stewart has some resources available to pay a fine. (PSR ¶ 54.) But while the balances in his accounts may seem substantial at first glance, the truth is that—besides Social Security and a small stipend from the VA—they are the only resources he has to support himself in retirement. As a sole proprietor, Mr. Stewart does not have a corporate 401k or pension to fall back on.

And he faces growing health expenses. He suffers from chronic obstructive pulmonary disease and atrial fibrillation, both of which will likely require medical treatment. And in the months to come, he will need surgery for both carpal tunnel syndrome and to replace his left knee.

In sum, Mr. Stewart has spent his life giving back to the community and helping others, often at the expense of building a more comfortable retirement for himself. There is, thus, no

reason to impose more than a one-year term of probation (on minimal conditions) and perhaps a small fine.

### 4.    A non-incarceration sentence provides adequate general deterrence.

Finally, the Court must consider the need to promote respect for the law and to adequately deter criminal conduct more generally. 18 U.S.C. § 3553(a)(2)(A) & (B).[2]

Here, a non-incarceration sentence and low fine would be sufficient to deter other potential offenders. As discussed above, a probationary sentence is not an insubstantial punishment. Prosecutions under this statute are also rare to begin with—FAA certificate matters are rarely if ever prosecuted criminally and there are very few cases about violations of the statute charged here. And, given Mr. Stewart's employment history and record of community involvement, he is not a likely model for other potential offenders.

Beyond that, studies have consistently shown that, while the fact of conviction influences crime rates, the severity of punishment does not. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28–29 (2006) ("Imaginable increases in the severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Sciences panels, all appointed by Republican presidents, reached that conclusion."). The Sentencing Commission itself has found "no correlation between recidivism and Guidelines offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." *Measuring Recidivism*, *supra*, at 15. Recent research shows this is especially true for white collar offenders. Mihailis E. Diamantis, *White-Collar Showdown*, 103 Iowa L. Rev. Online

---

[2]    Although Section 3553(a) lists several other factors—such as the need to avoid sentencing disparities—those factors are not particularly relevant here, given the unique factual background of Mr. Stewart's case and the parties' agreement on the appropriate guidelines range. That said, as discussed above, imposing any term of incarceration in this case would be out of step with the sentences imposed on nearly all Zone A offenders.

320, 326–27 (2017), available at: https://tinyurl.com/yyl993pk ("Recent data suggests . . . that the probability of getting caught looms larger in white collar criminals' calculus" than increased penalties.). Indeed, "[o]ne striking circumstance of the increasing incidence of white-collar fraud is that the sentencing ranges were increasing at the same time." *Id.* at 326. "In other words, doubling the chance of capture has a greater deterrent effect than doubling the sanction." *Id.* at 327. Especially given the unique nature of the charges here, there is thus no need to make an example of Mr. Stewart simply to warn future offenders against FAA regulatory offenses.

## CONCLUSION

Mr. Stewart has lived a long life according to his beliefs: giving back to others, donating his time and money to worthy causes, and being an anchor for his family. And he has already paid dearly for his one brush with the law. This Court should therefore impose only a one-year term of probation with minimal conditions and, if necessary, a fine at the lower end of the guidelines range.

Respectfully submitted,

*/s/ Paul M. Flannery*

Paul M. Flannery (OH: 0091480)
**Flannery | Georgalis LLC**
1375 E. 9th Street, 30th Floor
Cleveland, Ohio 44114
Tel/Fax: (216) 367-2094
paul@flannerygeorgalis.com

*/s/ W. Benjamin Reese*

W. Benjamin Reese (OH: 0096108)
**Flannery | Georgalis LLC**
175 South Third Street, Suite 355
Columbus, Ohio 43215
Tel/Fax: (216) 230-9041
breese@flannerygeorgalis.com

*Counsel for Mr. Stewart*

— 15 —

**CERTIFICATE OF SERVICE**

I certify that on August 1, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties registered with CM/ECF through the Court's electronic filing system. All other parties were served, as of the same date, by U.S. Mail.

*/s/ Paul M. Flannery*
Paul M. Flannery (OH: 0091480)